**Appeal Nos. 25-1341 and 25-1798**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Jordan Orozco Madero and Esteban Orosco
*Plaintiffs - Appellants/Cross-Appellees,*

v.

McLane Foodservice, Inc., et al.
*Defendants - Appellees/Cross-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
NO. 5:24-cv-00073-KK-DTB
HON. KENLEY KIYA KATO

**APPELLANTS/CROSS-APPELLEES' PRINCIPAL BRIEF**

Glenn A. Danas (270317)                 Aashish Y. Desai (187394)
Brent A. Robinson (289373)              Adrianne De Castro (238930)
CLARKSON LAW FIRM, P.C.              DESAI LAW FIRM, P.C.
22525 Pacific Coast Highway             3200 Bristol Ave., Suite 650
Malibu, CA 90265                        Costa Mesa, CA 92626
Tel.: (213) 788-4050                    Tel: (949) 614-5830
Fax: (213) 788-4070                     Fax: (949) 271-4190

*Attorneys for Plaintiffs - Appellants/Cross-Appellees*
*Jordan Orozco Madero and Esteban Orosco*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

INTRODUCTION ...........................................................................1

ISSUES PRESENTED ....................................................................4

STATEMENT OF JURISDICTION .................................................4

STATEMENT OF THE CASE .........................................................5

   I.   McLane asserts the Motor Carrier Act exemption as an affirmative defense to Plaintiffs' FLSA overtime claims. ...........5

   II.  The Parties file dueling motions for partial summary judgment on McLane's exemption defense. ..................................6

   III.  Most facts material to McLane's exemption defense were undisputed below................................................................6

   IV.  The Parties nonetheless hotly disputed the material fact of who was the relevant shipper, and the shipper's fixed and persisting intent as to the destination of goods transported interstate. ...................................................................10

   V.  The district court found that McLane is the relevant shipper, and that McLane conclusively intended any interstate goods ultimately to be delivered to its local restaurant customers. ..........................................................12

STANDARD OF REVIEW................................................................14

SUMMARY OF THE ARGUMENT ...................................................14

ARGUMENT ..................................................................................17

   I.   The district court erred by focusing its exemption analysis on McLane's intent, and not the intent of McLane's suppliers at the time they placed their goods in interstate commerce. ................................................................19

i

II.  The district court erred in granting partial summary judgment for McLane, and denying the same to Plaintiffs, because the undisputed facts conclusively demonstrate that McLane's suppliers' only fixed and persisting intent was to ship their goods to McLane's local warehouse............................ 34

CONCLUSION ........................................... 41

CERTIFICATE OF COMPLIANCE...................................... 44

CERTIFICATE OF SERVICE............................................. 45

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Atl. Coast Line R. Co. v. Standard Oil Co. of Ky.*
   275 U.S. 257 (1927) ........................................................21, 25, 36

*Bilyou v. Dutchess Beer Distribs., Inc.*
   300 F.3d 217 (2d Cir. 2002) .......................................... 22

*Black Star Farms, LLC v. Oliver*
   600 F.3d 1225 (9th Cir. 2010) ..................................... 14

*China Unicom (Ams.) Operations Ltd. v.*
   *Fed. Commc'ns Comm'n*
   124 F.4th 1128 (9th Cir. 2024) ................................... 33

*Clouthier v. County of Contra Costa*
   591 F.3d 1232 (9th Cir. 2010)...................................... 18

*Collins v. Heritage Wine Cellars, Ltd.*
   589 F.3d 895 (7th Cir. 2009) ...............................37, 38, 39

*Deherrera v. Decker Truck Line, Inc.*
   820 F.3d 1147 (10th Cir. 2016) ................................... 22

*Encino Motorcars, LLC v. Navarro*
   584 U.S. 79 (2018)........................................................ 19

*Enzo Biochem, Inc. v. Applera Corp.*
   599 F.3d 1325 (Fed. Cir. 2010) ................................... 18

*Guy v. Absopure Water Co.*
   No. 20-12734
   2023 U.S. Dist. LEXIS 20879 (E.D. Mich. Feb. 8, 2023) .............. 24

*Int'l Bhd. of Teamsters v. ICC*
   921 F.2d 904 (9th Cir. 1990)................................21, 32, 33

*Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*
   561 U.S. 89 (2010)........................................................ 23

*Klitzke v. Steiner Corp.*
  110 F.3d 1465 (9th Cir. 1997) .................................................. 29, 36

*Loper Bright Enters. v. Raimondo*
  603 U.S. 369 (2024) ....................................................................... 33

*McLeod v. Threlkeld*
  319 U.S. 491 (1943) ....................................................................... 27

*Montes v. United States*
  37 F.3d 1347 (9th Cir. 1994) ......................................................... 5

*Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*
  513 F.3d 949 (9th Cir. 2008) ........................................................ 24

*OneBeacon Ins. Co. v. Haas Indus.*
  634 F.3d 1092 (9th Cir. 2011) ...................................................... 24

*Project Hope v. M/V IBN SINA*
  250 F.3d 67 (2d Cir. 2001) ........................................................... 22

*Ramirez v. Fox Television Station, Inc.*
  998 F.2d (9th Cir. 1993) ................................................................. 5

*Sierra Club v. Kenna*
  No. 1:12-cv-1193 AWI JLT
  2013 U.S. Dist. LEXIS 4743 (E.D. Cal. Jan. 11, 2013) .................. 18

*Smith v. Ozmint*
  578 F.3d 246 (4th Cir. 2009) ........................................................ 18

*Southern Pacific Transp. Co. v. I.C.C.*
  565 F.2d 615 (9th Cir. 1977) .................................................. 30, 31

*Sullivan v. Oracle Corp.*
  547 F.3d 1177 (9th Cir. 2008) ...................................................... 18

*United States v. $19,054.00 in United States Funds*
  No. 5:10-CV-319 (MTT)
  2012 U.S. Dist. LEXIS 132154 (M.D. Ga. Sep. 17, 2012) ............. 19

*United States v. Four Parcels of Real Prop.*
  941 F.2d 1428 (11th Cir. 1991) .................................................... 19

iv

*Veliz v. Cintas Corp.*
No. C 03-1180 RS
2009 U.S. Dist. LEXIS 36328 (N.D. Cal. Apr. 23, 2009) .......... 28, 29

*Villalpando v. Exel Direct Inc.*
No. 12-cv-04137-JCS
2015 U.S. Dist. LEXIS 118065 (N.D. Cal. Sep. 3, 2015) ............... 32

*Walling v. Jacksonville Paper Co.*
317 U.S. 564 (1943) ................................................20, 27, 28, 29, 31

*Watkins v. Ameripride Servs.*
375 F.3d 821 (9th Cir. 2004) ...........................................1, 15, 31, 36

## Statutes

28 U.S.C. 1291 ............................................................................ 5

29 U.S.C.S. § 213(b)(1) ............................................................. 20

49 U.S.C.S. § 13102 ................................................................... 23

49 U.S.C.S. § 13501 ................................................................... 20

49 U.S.C.S. § 14706(a)(1) ......................................................... 24

49 U.S.C.S. § 31502 ................................................................... 20

UCC § 2-401(1) ...................................................................26, 35, 38

Cal. Com. Code § 2401(1) .....................................................26, 35, 38

## Rules

Fed. R. Civ. P. 30(b)(6) ............................................................. 10

## Regulations

29 C.F.R. § 782.7(a) .................................................................. 21

49 C.F.R. § 390.5 ...................................................................... 23

49 C.F.R. § 390.3T .................................................................... 23

**Other Authorities**

Black's Law Dictionary 1378 (6th ed. 1990) ................................. 22, 23

Federal Motor Carrier Safety Administration
   *Ex-Parte No. MC-207*
   1992 MCC LEXIS 50, 8 I.C.C. 2d 470 (1992)................................. 39

11 Moore's Federal Practice - Civil § 56.40 (2025) ............................ 18

## INTRODUCTION

This case concerns overtime requirements under the Fair Labor Standards Act. Congress exempted from overtime employees who transport goods from a place in one State to a place in another State.

Plaintiffs-Appellants Jordan Orozco Madero and Esteban Orosco ("Plaintiffs") worked for Defendant-Appellee McLane Foodservice Inc. ("McLane") as truck drivers. As is relevant here, Plaintiffs worked overtime hours transporting goods within California from McLane's local warehouse to McLane's local customers. McLane did not pay Plaintiffs overtime wages.

Circuit precedent provides, "If…a customer places orders with an out-of-state vendor, with delivery to the company's intrastate warehouse for future delivery to customers yet to be identified, the transportation chain culminating in delivery to the customer is considered intrastate in nature" such that the overtime exemption does not apply. *Watkins v. Ameripride Servs.*, 375 F.3d 821, 826 (9th Cir. 2004). Here, McLane placed orders with out-of-state vendors, which the vendors delivered via third-party carriers to McLane's warehouse for future delivery to customers yet to be identified.

1

Nonetheless, the district court held that Plaintiffs were exempt from overtime. The district court reasoned that McLane had always intended that the goods McLane purchased from out-of-state suppliers for eventual resale to local customers would ultimately be delivered to its local customers. The district court thus granted summary judgment for McLane on its affirmative defense of exemption and denied summary judgment to Plaintiffs on the same defense.

The district court erred for two reasons. *First*, the district court misapplied substantive law by focusing its exemption analysis on the wrong shipper. The person who owned the goods at the outset of interstate transport, who tendered those goods to the carrier for interstate transport, and who controlled all aspects of the interstate transport until delivery to McLane's warehouse was McLane's out-of-state supplier, not McLane.

*Second*, the district court's focus on the wrong shipper warped its analysis of undisputed material facts. The record conclusively shows that McLane's out-of-state suppliers only ever intended that their goods reach McLane's warehouse, where title passed to McLane on delivery. After delivery, McLane's suppliers had no control over the products, did not

track the products, and had no interest in what happened to the products. From the supplier's perspective, it made no difference whether the products they delivered ended up cooked and served to unknown customers at unknown chain franchise locations at points unknown in California or instead spoiled on McLane's shelves because the orders McLane anticipated failed to materialize. The district court erred in concluding otherwise.

For those reasons, Plaintiffs respectfully urge this Court to reverse the district court's orders granting summary judgment in favor of McLane and denying summary judgment in favor of Plaintiffs as to the Motor Carrier Act exemption. Alternately, at a minimum the record reflects a genuine dispute of material fact as to who the relevant shipper is, and what they intended as the ultimate destination of their goods at the time of placing their goods in interstate transport, such that the district court's grant of summary judgment in favor of McLane should be reversed.

## ISSUES PRESENTED

1. Whether the district court misapplied substantive law in holding that the relevant "shipper" for purposes of the FLSA's Motor Carrier Act exemption was McLane, a local reseller, rather than McLane's suppliers.

2. Whether the district court misapplied substantive law to the undisputed material facts, which conclusively demonstrated that any interstate transportation of goods terminated upon delivery to McLane's local warehouse, such that Plaintiffs' purely intrastate transportation of goods was not subject to the Secretary of Transportation's jurisdiction, and by extension was not subject to the FLSA's Motor Carrier Act exemption.

## STATEMENT OF JURISDICTION

The district court granted McLane's motion for summary judgment, dismissing with prejudice the only federal claims asserted in this action. 1-ER-4–17. The district court then struck the class allegations concerning the remaining California state law claims. 1-ER-2. The district court then entered an order dismissing the action below without prejudice to their

4

refiling in state court, based on its conclusion that it lacked jurisdiction over the remaining state law claims. 1-ER-3.

Because the dismissal of the action below is a "final decision[] of the district court" within the meaning of 28 U.S.C. 1291, this Court has jurisdiction. *Montes v. United States*, 37 F.3d 1347, 1350 (9th Cir. 1994) (dismissal of action is final and appealable); *Ramirez v. Fox Television Station, Inc.*, 998 F.2d 743, 746 (9th Cir. 1993) (district court's dismissal of complaint normally is not appealable, while dismissal of underlying action is).

## STATEMENT OF THE CASE

Plaintiffs worked for McLane as truck drivers delivering goods from McLane's Riverside Distribution Center ("RDC") in Riverside, California.

## I. McLane asserts the Motor Carrier Act exemption as an affirmative defense to Plaintiffs' FLSA overtime claims.

Plaintiffs filed a putative class and collective action complaint in the district court asserting putative class and collective action claims including (1) claims for failure to pay overtime wages under the Fair Labor Standards Act ("FLSA"), and (2) additional wage and hour claims arising under California law. 6-ER-1222–1227.

After the district court stayed consideration of Plaintiffs' motion for conditional certification of the FLSA overtime claim (Dkt. 23 at 9–10), Plaintiffs filed their First Amended Complaint ("FAC"), 6-ER-1190-1206. In its Answer, McLane asserted various affirmative defenses, including, as is relevant here, that Plaintiffs are exempt under the FSA's Motor Carrier Act Exemption.

## II. The Parties file dueling motions for partial summary judgment on McLane's exemption defense.

The Parties both filed motions for partial summary judgment to adjudicate McLane's affirmative defense under the FLSA's Motor Carrier Act exemption defense. 5-ER-1033:8–24; 4-ER-773–784.

## III. Most facts material to McLane's exemption defense were undisputed below.

In adjudicating that affirmative defense, the district court ultimately concluded that the material facts before it were undisputed. Specifically, the district court found the following facts undisputed:

1. The majority of products McLane purchased from suppliers and then resold to local restaurant customers originated from suppliers located outside California. 1-ER-8.

2. **Interstate shipments are not based on then-existing orders.** At the time McLane purchases products from suppliers, its purchases are not based on specific orders for its restaurant customers, and McLane may not know the final destination of the products it is ordering. 1-ER-14.

3. **Interstate shipments are based on McLane's projections of anticipated sales volume, not its suppliers' projections.** McLane purchases products from suppliers based on its projections of anticipated sales volume for orders to be subsequently placed by its local restaurant customers. 1-ER-9.

4. **McLane does not process or modify the products before resale.** McLane does not process, repackage, or substantially modify the goods received at the RDC before reselling and distributing those goods to its restaurant customers. 1-ER-9–10.

5. **McLane and its ultimate customers bear the estimated cost of inbound and outbound transportation.** McLane, and not its suppliers, bears the ultimate cost of inbound and outbound transportation of the products it sells, and is permitted to incorporate only agreed approximations of those costs in the prices it charges its

local restaurant customers through markups. 1-ER-9; 7-ER-1296, ¶ 2(a), (c-e); 2-ER-67:15–22. (McLane: "[T]he *undisputed* fact [is] that [McLane] bears the ultimate payment for transportation costs for inbound freight.").

6. **McLane tracks products after delivery to the RDC and might be able to track inbound shipments too.** McLane tracks the products it sells once they reach its warehouse and thereafter through to their ultimate destination after resale. In addition, McLane offered speculation that it "may in fact be able to track" products during inbound shipments from its suppliers. 2-ER-270–271, ¶ 17.

7. The largely perishable goods Plaintiffs transported were stored at the RDC on average for 13 days. 1-ER-8.

While not addressed by the district court in its decision, the following material facts were also undisputed by the Parties:

1. **McLane takes title to the goods.** McLane takes unencumbered title to the goods purchased from its suppliers, and transfers title to its restaurant customers free and clear from any encumbrances. 7-ER-1323, ¶ 18(e)(i); 7-ER-1303, ¶ 2(r).

2. While inside McLane's RCS, the goods were solely under McLane's control, and not the control of its suppliers. 2-ER-263, ¶ 9.

3. **McLane stores products in general inventory and allocates products for distribution after orders are received.** McLane only arranges distribution of products to its restaurant customers after retail customers submit orders to purchase those products; prior to that time, those products remain either in general inventory, or, if the products are proprietary to specific chains, in segregated inventory in warehouse aisles reserved for storing that chain's proprietary inventory prior to resale to affiliated restaurant customers. 2-ER-270, ¶ 16.

4. McLane owns the RDC warehouse. 2-ER-263, ¶ 8

5. **Interstate shipments from suppliers are transported by separate carriers, not by McLane.** 2-ER-263–264, ¶ 10. While McLane offered evidence that it "manages the transportation of certain products from suppliers shipped to the [RDC] by using its own in-house third party freight provider, Vantix," and that "[A]pproximately 40-50% of inbound freight to the Riverside DC is managed by Vantix," McLane offered no evidence on whether any, and

if so, what proportion of, *interstate* shipments from suppliers are transported by Vantix. 5-ER-1003:16-23.

## IV. The Parties nonetheless hotly disputed the material fact of who was the relevant shipper, and the shipper's fixed and persisting intent as to the destination of goods transported interstate.

While the other material facts were undisputed, the Parties below hotly disputed who the relevant shipper was for purposes of the Motor Carrier Act exemption, and by extension what the relevant shipper's intention was in transporting goods interstate.

Plaintiffs identified the relevant "shippers" as the suppliers who shipped the relevant goods across state lines to the RDC in Riverside, California, and offered undisputed facts to show that the shippers' intent was *only* that their goods would reach the RDC.  5 ER 1018:24–1019:9. By contrast, McLane insisted that it was the relevant shipper, and that it always intended that goods shipped in interstate transport would ultimately be delivered to its local restaurant customers.

Thus, Plaintiffs cited as an undisputed fact that McLane's suppliers are "separate entities with no corporate ties to McLane." 2-ER-263, ¶ 10.

Plaintiffs also offered party-opponent admissions by McLane's designated representative under Fed. R. Civ. P. 30(b)(6) to the effect that

10

McLane's suppliers ship their goods directly to the RDC, although McLane responded with evidence showing that those suppliers' goods were ultimately intended by McLane and its chain customers for McLane's local restaurant customers. 2-ER-264–265, ¶ 11.

Plaintiffs also offered evidence that McLane takes title to the products shipped by its suppliers, then resells those goods to its local restaurant customers, while McLane offered evidence showing McLane always intended that those goods would be ultimately delivered to its restaurant customers. 2-ER-265–266, ¶ 12.

McLane offered evidence of its own intent that the goods it purchased from out-of-state suppliers would ultimately be resold at a markup and distributed to local restaurants, and the district court concluded this evidence was undisputed. Specifically, it was undisputed that McLane operated under national distribution agreements with various national fast-food restaurant chains to supply and distribute food and other goods, both proprietary and not, to local restaurant customers affiliated with those chains. 1-ER-8. The national chains generally identified suppliers McLane had to use and required McLane to purchase food and other goods from those suppliers in a sufficient volume to cover

11

anticipated orders from local chain restaurants. 1-ER-9.

McLane offered a sample national distribution agreement. 7-ER-1293. The sample agreement required McLane to enter into standard form supplier agreements with each supplier, although McLane offered no such agreements in evidence at summary judgment. 7-ER-1295, ¶ 1(e). The sample agreement further specifies that suppliers are required to transfer unencumbered title to McLane. 7-ER-1323, ¶18(e)(i). The sample agreement similarly requires McLane to transfer unencumbered title to its restaurant customers. 7-ER-1303.

## V. The district court found that McLane is the relevant shipper, and that McLane conclusively intended any interstate goods ultimately to be delivered to its local restaurant customers.

The district court ultimately concluded that the relevant shipper for purposes of the exemption is McLane, and not its suppliers. 1-ER-13–14. The district court therefore never addressed the significance of the suppliers' intent in shipping goods interstate to McLane's local facility.

In holding that the Motor Carrier Act exemption applied to Plaintiffs, the district court concluded that the undisputed facts showed that Plaintiffs' intrastate deliveries were part of a "practical continuity of movement" from the out-of-state suppliers, through McLane's

12

warehouse, and on to McLane's local restaurant customers. 1-ER-13. As key evidence of McLane's intent, the district court cited McLane's master distribution agreements as showing that products that McLane purchased from out-of-state vendors were intended (by whom is not stated) to ultimately be delivered locally to McLane's restaurant customers. 1-ER-13–14. ("Thus, the Distribution Agreement between Defendant and [Buffalo Wild Wings] demonstrates the intent [(but whose?)] to have the out-of-state delivery of BWW chicken terminate at the California-based BWW Restaurant Customer.").

The district court also found the fact that McLane bore all inbound and outbound shipping costs supported McLane's interstate intent as a shipper, as well as the facts that McLane only stored the products at its warehouse for two weeks on average, did not repackage the goods, and stored each brand's proprietary goods separately in the warehouse. 1-ER-14.

The district court considered, but seemingly assigned little weight to, the fact that McLane did not know which customers would receive the goods, if any, at the time it placed orders with its suppliers. 1-ER-14–15.

Having found that Plaintiffs were therefore exempt from overtime requirements under the FLSA's Motor Carrier Act exemption,[1] the district court granted McLane's motion for partial summary judgment and dismissed Plaintiffs' FLSA claims with prejudice. 1-ER-17.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed *de novo*. *Black Star Farms, LLC v. Oliver*, 600 F.3d 1225, 1229 (9th Cir. 2010) ("We review *de novo* a district court's grant of summary judgment … .").

## SUMMARY OF THE ARGUMENT

The FLSA's Motor Carrier Act exemption applies to employees who transport goods from "a place in one state" to "a place in another state." However, for employees like Plaintiffs who transport goods within a

---

[1] The district court also, in the alternative, concluded that Plaintiffs were separately exempt as to each four-month period following each Plaintiff's having driven an interstate route, thereby applying what is known as the "four-month rule." 1-ER-15–17. Accordingly, the district court concluded that Plaintiff Orozco Madero was exempt at most from January 2020 to July 2022, and that Plaintiff Orosco was exempt at most from December 2019 to March 2022.

Plaintiffs do not challenge this portion of the district court's decision in their appeal. If Plaintiffs prevail in challenging the district court's primary holding under the Motor Carrier Act exemption, then the district court's alternative application of the four-month rule would result in Plaintiffs retaining viable FLSA overtime claims on remand.

single State, Congress only intended to apply the exemption if such intrastate transport is merely a practical continuation of the interstate transportation of goods. This determination turns on whether the "essential character" of the shipment remains interstate, as indicated by the original interstate shipper having a "fixed and persisting intent" at the time of shipping that the goods would reach their ultimate destination.

The language of the Motor Carrier Act speaks in terms of transportation between a place in one state and a place in another state. Congress could have, but expressed no intention to, regulate purely intrastate shipments based on their effect on interstate commerce. Case law confirms that in situations where, as here, a shipper transports goods interstate to a local warehouse, whereupon a separate shipper buys the goods, then resells and transports the goods intrastate for delivery to local customers based on orders received after the goods arrived in the warehouse, the local deliveries from the warehouse are "considered intrastate in nature." *Watkins v. Ameripride Servs.*, 375 F.3d 821, 826 (9th Cir. 2004). This is because the exemption turns on the intent at the time of shipment of the person who placed goods in interstate

15

transportation, such as a vendor who intended to ship the goods interstate to the local distributor's warehouse, but no further.

Here, the district court erred first in concluding that the relevant shipper is McLane, rather than McLane's suppliers. The suppliers are the ones who owned the goods, on whose account the interstate carrier transported the goods to McLane's warehouse, and who directed and controlled the goods throughout their interstate journey. Second, the district court erred in concluding that the relevant shipper intended that their goods reach anywhere other than the warehouse. Once the goods were delivered to McLane's local warehouse, the shipper passed clean title to the goods to McLane. Thereafter, the supplier and its interstate carrier had no control over the products, and no interest in what happened to them. From the supplier's perspective, it did not matter whether its products ended up cooked and served to unknown customers at unknown chain franchises in California or instead spoiled on McLane's shelves because the orders McLane had anticipated failed to materialize. The record conclusively shows that the suppliers' only intent at the outset of transportation was that their product reach McLane's loading dock.

Viewed through the relevant case law, the record is conclusive that the practical continuity of the movement of goods in interstate commerce terminated at McLane's warehouse. The district court erred in concluding otherwise, and its order granting summary judgment in favor of McLane and denying summary judgment in favor of Plaintiffs as to the Motor Carrier Act exemption, should be reversed to that extent. Alternately, at a minimum the record reflects a genuine dispute of material fact as to who the relevant shipper is, and what they intended as the ultimate destination of their goods at the time of placing their goods in interstate transport, and the district court's grant of summary judgment in favor of McLane should be reversed.

## ARGUMENT

The district court erred by granting partial summary judgment against Plaintiffs' overtime claim under the FLSA based on McLane's Motor Carrier Act affirmative defense, because it misapplied substantive law in determining who was the relevant shipper, and separately in assessing the relevant shipper's intentions regarding where their goods would be shipped.

In reviewing the district court's grant of summary judgment *de novo*, this Court must determine whether, in the light most favorable to Plaintiffs, "there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Sullivan v. Oracle Corp.*, 547 F.3d 1177, 1181 (9th Cir. 2008). A genuine dispute of material fact exists if the record includes evidence that would permit a reasonable jury to find for the nonmoving party. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1237, 1245–1254 (9th Cir. 2010).

Where, as here, the moving party bears the ultimate burden of proof and persuasion as to its exemption defense, "the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment," or a reversal of a grant of summary judgment on appeal. *See* 11 Moore's Federal Practice - Civil § 56.40 (2025) (citing, *e.g.*, *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1337 (Fed. Cir. 2010); *Smith v. Ozmint*, 578 F.3d 246, 250–254 (4th Cir. 2009)); *Sierra Club v. Kenna*, No. 1:12-cv-1193 AWI JLT, 2013 U.S. Dist. LEXIS 4743, at *11 (E.D. Cal. Jan. 11, 2013) ("When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by

presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party."), citing *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*)[2]. McLane bore the burden of proving its exemption defense by a preponderance of the evidence. *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88-89 (2018). As explained below, McLane failed to meet its burden of conclusively proving by a preponderance of the evidence that the Motor Carrier Act exemption applied to Plaintiffs' purely local transportation of goods. The district court accordingly erred in granting summary judgment in favor of McLane on its affirmative defense of exemption.

## I. The district court erred by focusing its exemption analysis on McLane's intent, and not the intent of McLane's suppliers at the time they placed their goods in interstate commerce.

The key question for application of the exemption here, is who is "the shipper" whose "fixed and persisting intent" to deliver goods to McLane's individual restaurant customers McLane had to demonstrate. The district court concluded that *McLane* is the shipper whose intent

---

[2] Superseded by statute on other grounds as stated in *United States v. $19,054.00 in United States Funds*, No. 5:10-CV-319 (MTT), 2012 U.S. Dist. LEXIS 132154, at *9 (M.D. Ga. Sep. 17, 2012)

controls application of the Motor Carrier Act exemption. 1-ER-13–15. This was reversible error for failure to correctly apply substantive law.

The FLSA requires payment of overtime to employees engaged in interstate commerce, but exempts "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service" pursuant to the Motor Carrier Act. *See* 29 U.S.C.S. § 213(b)(1). The Motor Carrier Act authorizes the Secretary of Transportation to prescribe maximum hours of service requirements for employees of a motor carrier engaged in "transportation" as defined. *See* 49 U.S.C.S. § 31502. The Secretary's jurisdiction extends to "transportation by motor carrier and the procurement of that transportation, to the extent that … property … [is] transported by motor carrier (1) between a place in (A) a State and a place in another State." *See* 49 U.S.C.S. § 13501.

In defining the scope of the FLSA, and the still narrower scope of the Secretary of Transportation's jurisdiction, "Congress did not exercise . . . the full scope of the commerce power." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 570 (1943) (applying FLSA; decided before Motor Carrier Exemption was enacted in 1966). Thus, an employee may be

engaged in interstate commerce and therefore covered by the FLSA, but will only fall within the Secretary's jurisdiction and be exempt from overtime under the FLSA if he or she transports goods or people in interstate commerce within the meaning of the Motor Carrier Act. *See* 29 C.F.R. § 782.7(a).

In evaluating the Secretary of Transportation's jurisdiction regarding the local transportation of goods originating out-of-state, precedent has focused the analysis around whether the "essential character" of the shipment remains interstate through to the destination. This "essential character" analysis, in turn, focuses on the out-of-state shipper's "fixed and persisting intent" regarding the goods' destination at the time of the initial interstate shipment. *See, e.g.*, *Atl. Coast Line R. Co. v. Standard Oil Co. of Ky.*, 275 U.S. 257, 269 (1927) ("*Standard Oil*") (asking whether the final destination of the shipment is "arranged for or fixed in the minds of the sellers" at the time the initial segment of the journey commenced); *Int'l Bhd. of Teamsters v. ICC*, 921 F.2d 904, 908 (9th Cir. 1990) (purely intrastate transport was essentially interstate due to presence of detailed storage-in-transit provision that confirmed a fixed and persisting intent at the time of shipping ultimately to transport the

21

goods to interstate destinations); *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1154-58 (10th Cir. 2016) (drivers who returned empty kegs to local brewery from local warehouse were nonetheless engaged in interstate transport, because the interstate shippers obviously intended to return the brewery's kegs to the brewery as their final destination at time of shipment).

The appropriate intent inquiry is "fixed" in the sense that courts must look to "the intended final destination of the transportation when that ultimate destination was envisaged *at the time the transportation commenced.*" *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 224 (2d Cir. 2002) (emphasis added); *see also Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74-75 (2d Cir. 2001) ("Where multiple carriers are responsible for different legs of a generally continuous shipment," the intent at the time of departure "fixes the character of the shipment for all the legs of the transport within the United States.").

Similarly, dictionary definitions, Congress's intent in regulating interstate transportation, and the Secretary of Transportation's definition, all illuminate what it means to be the "shipper" of goods, as in the Motor Carrier Act. *See* "Shipper," Black's Law Dictionary 1378 (6th

22

ed. 1990) ("one who *engages the services of a carrier of goods. One who tenders goods to a carrier for transportation*; a consignor. *The owner* or person *for whose account the carriage of goods is undertaken*"), emphasis added. The Secretary of Transportation agrees and says "Shipper means a person who tenders property to a motor carrier or driver of a commercial motor vehicle for transportation in interstate commerce...." *See* 49 C.F.R. 390.5; 49 C.F.R. 390.3T (definition "applicable to all employers, employees, and commercial motor vehicles that transport property or passengers in interstate commerce").

Congress also agrees. In regulating moving companies, Congress defined an "Individual Shipper" entitled to protections as the person who (A) ships household goods, is "(B) identified as the shipper, consignor, or consignee on the face of the bill of lading; (C) owns the goods being transported; and (D) pays his or her own tariff transportation charges." 49 U.S.C.S. § 13102.

Similarly, Congress adopted a uniform national rule imposing liability for damaged or lost goods on the receiving and delivering carriers regardless of which carrier is at fault. *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 98 (2010); *see also* 49 U.S.C.S. §

23

14706(a)(1) (liability of motor carriers and freight forwarders). Congress thereby provided for carriers to be "liable to the person entitled to recover under the receipt or bill of lading" for any loss or injury to the property caused by any carrier during shipment. 49 U.S.C.S. § 14706(a)(1). A bill of lading is, of course, a contract between the carrier and the shipper. *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 954 (9th Cir. 2008). As such, Congress's understanding is that "the shipper" is the person who owns the goods transported by the carrier and contracts with the carrier for their transportation, and as such, can hold the carrier liable for damage or loss to the products during transport. *OneBeacon Ins. Co. v. Haas Indus.*, 634 F.3d 1092, 1096-99 (9th Cir. 2011) (for persons other than the shipper, courts must interpret bill of lading to determine who has requisite interest to hold carrier liable).

Accordingly, for purposes of Congress's intended scope of the Motor Carrier Act exemption, the shipper is the "owner" of the goods who "tenders goods" to a carrier for interstate transport and controls the interstate transportation. *Compare Guy v. Absopure Water Co.*, No. 20-12734, 2023 U.S. Dist. LEXIS 20879, at *11-12 (E.D. Mich. Feb. 8, 2023) (for purposes of Motor Carrier Act exemption, "the shipper [is] the entity

24

that functionally plays the most significant role in directing and controlling the transportation of goods"), citing *Collins,* 589 F.3d at 896, 898.

*Standard Oil* is instructive. In *Standard Oil,* the seller of oil chartered tank steamers to transport oil from its refineries in Louisiana and Mexico to storage facilities owned by the buyer on the Florida coast. *Standard Oil,* 275 U.S. at 261-66. The buyer took title upon delivery, then transferred the oil without modification to storage terminals it owned until, based on consumer demand, the buyer then shipped them to bulk stations throughout Florida using rail tank cars it leased that were hauled by railroads. *Id*. The railroad then sought to charge interstate rates, based on the shipments being part of a continuous journey in interstate commerce. *Id*. However, the Supreme Court instead held that the shipments from the storage terminals to the bulk stations were *intra*state journeys, citing as the "important controlling fact" that the buyer's "whole plan" was to hold the oil at its storage facility to await "convenient distribution," and that it did not intend to complete the further shipments to the bulk stations "by immediate continuity of transportation." *Id*. at 269. The Supreme Court explained that the

storage facility was the natural place to change from interstate to intrastate transportation, not least because the sellers had no intention to transport their products farther than the storage facilities, and neither the seller nor the interstate carrier (the railroad) played any part in determining the ultimate destinations of the products. *Id*.

The same analysis should apply here. In this case, the party that "owns" the goods at issue, "tenders" those goods for interstate transport, and controls all aspects of the interstate transport until delivery to the RDC warehouse, is McLane's out-of-state supplier, not McLane.[3] In concluding otherwise, the district court failed to apply substantive law, and its error requires reversal.

The district court's cited authorities only confirm its error.

---

[3] McLane failed to produce but is in possession of contracts with its suppliers that clarify when title transfers to McLane, and which counterparty is required to arrange shipment for the interstate transport to McLane's RCS warehouse. 7-ER-1295, ¶ 1(e). All inferences should be drawn in favor of Plaintiffs, the non-moving party, including that those withheld contracts require the suppliers to arrange the interstate transport to McLane's RDC warehouse, and provide for title not to pass until after tender and delivery at the RDC. Moreover, California law and the Uniform Commercial Code generally provide for title of goods to transfer upon delivery, unless the contract provides otherwise. *See* Cal. Com. Code § 2401(1); UCC § 2-401(1). Because no evidence of actual contracts would support a deviation from the standard legal rule, title presumptively transferred at delivery to the RDC.

The district court relied on *Walling v. Jacksonville Paper Co.* (1943) 317 U.S. 564, but this reliance was misplaced for the simple reason that *Walling* did not consider Congress's intended scope of the Secretary of Transportation's jurisdiction, but instead the broader scope Congress intended for the Fair Labor Standards Act. *Id.* at 565-566. Congress's expansive power to regulate interstate commerce extends broadly to all activity *affecting* interstate commerce, whereas the FLSA is more narrowly tailored to those employees "engaged" in interstate commerce. *McLeod v. Threlkeld*, 319 U.S. 491, 493-94 (1943). The Secretary of Transportation's jurisdiction is narrower still and only extends to employees who transport goods from a place in one state to a place in another state. *Collins*, 589 F.3d at 898. *Walling* evaluated the FLSA's scope some 20 years before the Motor Carrier Act exemption was enacted and simply does not control here.

Moreover, the district court relied on *Walling* for the notion that a "contract or understanding pursuant to which goods are ordered... indicates where it was intended that the interstate movement should terminate." 1-ER-14, quoting *Walling*, 317 U.S. at 569. However, this turns the quoted analysis from *Walling* on its head. In the quoted

27

language, *Walling* explained that there is a practical continuity of interstate movement where "goods [are] delivered pursuant to a *prior* order, contract, or understanding," *i.e.* where the interstate order is initiated specifically to fill existing customer orders already in hand. *Walling*, 317 U.S. at 569-70 (emphasis added). Yet *Walling* went on to explain that a "wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit" even for purposes of engaging in commerce for purposes of the FLSA. *Id.* at 570. Indeed, the record in *Walling* showed that the defendant's interstate orders had been placed based on projections of the highly predictable anticipated future orders of a very small and discrete group of local customers, yet the Supreme Court found that record nonetheless "lacks that particularity necessary to show that the goods in question were different from goods acquired and held by a local merchant for local disposition." *Id. Walling* thus undermines the district court's holding.

Similarly, the district court quoted *Veliz v. Cintas Corp.*, No. C 03-1180 RS, 2009 U.S. Dist. LEXIS 36328, at *15-17 (N.D. Cal. Apr. 23,

2009) for the same basic proposition as it cited *Walling* above, yet in doing so compounded its misinterpretation of *Walling*. The language the district court quoted from *Veliz* merely summarized *Walling*'s holding that interstate shipments based on existing orders constitute a practical continuity of movement. *Id*. But in the very next paragraph, *Veliz* confirms the preceding analysis: "the [*Walling*] Court indicated that a third type of shipment, goods ordered in anticipation of the needs of specific customers, may fall within the practical continuity of interstate commerce," but there the defendant's evidence showing orders based on projected future orders "had not demonstrated with particularity that the goods in question were different from those acquired and held for local disposition." *Id*. at *15-17.

The district court also relied heavily on *Klitzke v. Steiner Corp.*, 110 F.3d 1465 (9th Cir. 1997), but that decision is readily distinguishable. *Klitzke* concerned interstate shipments based on orders already in hand, unlike here. *Id*. at 1469 (the defendant "receives its customers' orders and immediately places them with the out-of-state vendors. The orders are placed for specific customers…."). As such, *Klitzke* had no trouble finding continuous interstate transportation, because "the orders were placed

29

and the goods were shipped to satisfy [existing] contracts between Steiner and its customers that specified a final place of delivery within Oregon other than the Steiner warehouse." *Id.* at 1470. By contrast, here McLane did not order goods from vendors based on existing orders already in hand, but instead ordered what McLane thought it might be able to resell from inventory in the future.

The district court also cited *Southern Pacific Transp. Co. v. I.C.C.*, 565 F.2d 615 (9th Cir. 1977), but that case also undermines its holding. *Southern Pacific* concerned purely local shipments from local fruit canneries to a local warehouse, with transit provisions in the bills of lading indicating an intent for continuous interstate transit, and the original shipper having expected that most such goods would ultimately be shipped to interstate customers. *Id.* at 616-617. Nonetheless, *Southern Pacific* reversed the ICC's finding of jurisdiction and found that "the only intent manifested by the shipper in this case at the time of shipment (*i.e.*, shipment from the canning plants) was to ship the goods to the warehouse for eventual transshipment to an as yet unknown destination." *Id.* at 617. As to the shipper's expectation of ultimate interstate delivery based on highly predictable anticipated future orders,

30

*Southern Pacific* held "that expectation is not sufficient to supply the requisite 'fixed and persisting transportation intent at the time of the shipment.'" *Id.* at 618. Indeed, *Southern Pacific* found particularly significant that the shipper, "did not decide the final destination of any shipment of goods until after the goods had come to rest in the Stockton warehouse," as here. *Id.*

The district court also cited *Watkins v. Ameripride Servs.*, 375 F.3d 821 (9th Cir. 2004), but again *Watkins* does not support the district court's holding. *Watkins* followed *Southern Pacific* in holding, "If…a customer places orders with an out-of-state vendor, with delivery to the company's intrastate warehouse for future delivery to customers yet to be identified, the transportation chain culminating in delivery to the customer is considered intrastate in nature." *Id.* at 826. Because the record in *Watkins* showed, as here, that the goods sold by the employer "were fungible, and were taken from general inventory after the customer made an order," then those goods "were not delivered in interstate commerce." *Id.* "It would not be a fair reading of *Steiner*, [*Walling v.*] *Jacksonville Paper*, and *Southern Pac.* to characterize these intrastate deliveries as within the 'practical continuity of [interstate] movement'

31

from the out-of-state vendor through the in-state company (Ameripride) to the in-state customer." *Id.* at 827.

The district court cited *Villalpando v. Exel Direct Inc.*, No. 12-cv-04137-JCS, 2015 U.S. Dist. LEXIS 118065, at *9-12 (N.D. Cal. Sep. 3, 2015), but *Villalpando denied* summary judgment as to the Motor Carrier Act exemption, and the quoted language itself merely quotes just one of the multiple unweighted factors stated in the Interstate Commerce Commission's MC-207 guidance. 1-ER-14. Moreover, *Villalpando* has facts distinguishing it from this case, including that the retailers for whom the products at issue were delivered locally had maintained title to, and apparent control over, those products from the inception of interstate transportation and on through the local warehouse, and typically tracked those products from out-of-state manufacture through to local delivery, both unlike here. *Id.* at *9.

Finally, the district court relied on *Int'l Bhd. of Teamsters, etc. v. I.C.C.*, 921 F.2d 904, 910 (9th Cir. 1990), but that reliance was misplaced for two reasons. First, *Teamsters*' central holding is that purely intrastate movements of goods are intended to be interstate when the shipping contract includes detailed and *bona fide* storage-in-transit provisions,

32

something categorically absent here. *Id*. at 910 ("Rather than operating as a mere stamp that the second leg of the trip is interstate, the terms of the storage-in-transit provision ensure that there exists a legitimate business purpose for the provision, and that JRC intends that the goods travel in interstate commerce.").

Second, the district court quoted *Teamsters* for its discussion of goods being shipped based on anticipated future customer demand derived from historical data. *See* 1-ER-15, citing *Teamsters*, 921 F.2d at 910. Yet that portion of *Teamsters* merely restates the ICC's reasoning, to which the panel deferred because it was neither arbitrary nor capricious, pursuant to *Chevron* deference that no longer applies. *Id*. at 907-910. Such deference to administrative guidance is no longer required. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024); *China Unicom (Ams.) Operations Ltd. v. Fed. Commc'ns Comm'n*, 124 F.4th 1128, 1143 (9th Cir. 2024) (courts now review agency interpretations of statutes *de novo*).

In short, the district court erred when it concluded that McLane is the shipper whose intent controls application of the Motor Carrier Act exemption. 1-ER-13–15. This was reversible error for failure to correctly

33

apply substantive law. Instead, the shippers whose intent must be measured at the time of shipment, are McLane's suppliers.

## II. The district court erred in granting partial summary judgment for McLane, and denying the same to Plaintiffs, because the undisputed facts conclusively demonstrate that McLane's suppliers' only fixed and persisting intent was to ship their goods to McLane's local warehouse.

Because the district court focused its analysis of intent on the wrong shipper, it naturally concluded that McLane had only ever intended that the goods it bought from out-of-state suppliers be ultimately delivered to its local restaurant customers. 1-ER-13–15. Yet if the district court had instead analyzed the record through the lens of the correct shipper's intent, namely McLane's shippers, the record conclusively required it to deny summary judgment to McLane and instead grant summary judgment for Plaintiffs on McLane's exemption defense.

Consider the record evidence from the perspective of an out-of-state supplier who contracts with McLane to supply products. To secure access to a stable and high-volume marketplace for its products (fast-food restaurants are legion and have highly dependable sales volume regardless of market conditions), the supplier enters into agreements with national chains by which the supplier agrees to sell its products to

the chain's independent distributors for a fixed price, and to transfer clean title to distributors. 7-ER-1293; 7-ER-1323, ¶ 18(e)(i). The supplier then contracts with particular distributors using standardized form contracts, which require the supplier to deliver goods to the distributor's local warehouse at the agreed price, subject to markup for the cost of transport. 7-ER-1323, ¶ 18(e)(i); 7-ER-1297, ¶ 2(c). The supplier uses either its own carriers, or third-party carriers that are "separate entities with no corporate ties to McLane." 2-ER-263, ¶ 10.[4]  Once the supplier tenders delivery at the RDC, clean title passes to McLane. 7-ER-1323, ¶ 18(e)(i); Cal. Com. Code § 2401(1); UCC § 2-401(1). Thereafter, the supplier and its interstate carrier have no control over the products, do not track their products, and have no interest in what happens to the products. From the supplier's perspective, it does not matter whether its products end up cooked and served to unknown customers at unknown chain franchise locations at points unknown in California or instead

---

[4] Again, McLane offered evidence that it uses a subsidiary carrier to transport a portion of inbound shipments but offered no evidence as to whether or to what extent that subsidiary handles interstate transportation from out-of-state suppliers. 2-ER-263, ¶ 10. Absent evidence on this point, all inferences must be drawn in favor of Plaintiffs, including that McLane's subsidiary only handles inbound transport from local suppliers to the RDC warehouse.

spoiled on McLane's shelves because the orders McLane anticipated failed to materialize. 7-ER-1323, ¶ 18(e)(i). *Compare Standard Oil,* 275 U.S. at 269 ("Neither the sellers who deliver the oil, nor the railroad company that aids the delivery of the oil to the storage tanks and tank cars at the seaboard, has anything to do with determining what the ultimate destination of the oil is, or has any interest in it, or has any duty to discharge in respect to it….").

When viewed through that correct lens, with the supplier fixed as the interstate shipper whose intent is to be measured, the evidence overwhelmingly confirms that application of the Motor Carrier Act exemption to Plaintiffs' purely intrastate transit of goods was error as a matter of law.

This Court "must examine the character of the shipments he was charged with delivering, and the intent of the shippers as to the ultimate destination of the goods." *Watkins*, 375 F.3d at 825, citing *Klitzke*, 110 F.3d at 1469. This requires considering the "entire panoply of 'facts and circumstances surrounding the transportation.'" *Id.*, quoting *Klitzke*, 110 F.3d at 1469. However, where, as here, "a customer places orders with an out-of-state vendor, with delivery to the company's intrastate

36

warehouse for future delivery to customers yet to be identified, the transportation chain culminating in delivery to the customer is considered intrastate in nature." *Id.* at 826.

The Seventh Circuit Court of Appeals' decision in *Collins* identifies perhaps the most significant facts and circumstances for application of the exemption to intrastate shipment of goods originating from out-of-state. *Collins,* 589 F.3d at 899-900. *Collins* concluded that where the following "conditions are satisfied, the intrastate leg at the end of the shipment should be deemed part of an interstate shipment":

> (1) the shipper, although it doesn't have to have lined up its ultimate customers when the product arrives at the warehouse, "bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis"; (2) "no processing or substantial product modification of substance occurs at the warehouse"; (3) "while in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation"; and (4) "the shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier" (this goes to the shipper's responsibility for the original interstate journey).

*Id.* at 899-900.

Here, the first *Collins* requirement, that the shipper base the volume shipped on projections of customer demand, is not satisfied. There is no evidence to suggest McLane's suppliers are shipping based

37

on their own projections of McLane's customers' demand. As such, this Court should infer that McLane's supplier only ships the exact amount McLane orders. Nor is the third *Collins* requirement satisfied, that the goods be subject to the shipper's control in the warehouse and that the shipper control the subsequent transportation to local destinations. McLane's suppliers pass title to McLane free and clear upon delivery and have neither interest nor control over what happens thereafter. 7-ER-1323, ¶ 18(e)(i); Cal. Com. Code § 2401(1); UCC § 2-401(1). Finally, as to the fourth *Collins* requirement that the shipper bear the ultimate payment for transportation charges, the only evidence on the record is that McLane ultimately bears the transportation charges, but the record is silent on whether and to what extent the shipper pays the interstate carrier directly and is reimbursed by McLane via subsequent invoice. *See* 1-ER-9; 7-ER-1296, ¶ 2(a), (c–e); 2-ER-67, ¶ 25. Absent affirmative evidence adduced by McLane to satisfy its burden of production as to its affirmative defense, and given McLane's admitted uncertainty about whether it can track products during interstate transport, all inferences must be drawn in Plaintiffs' favor, including that McLane's suppliers retained full responsibility for the original interstate journey. 2-ER-270–

38

271, ¶ 17. Because the *Collins* test requires all elements to be met, McLane's failure to satisfy three out of four elements confirms that Plaintiffs' intrastate transport of goods for McLane is not subject to the Motor Carrier Act exemption. *Collins,* 589 F.3d at 899-900.

The *Collins* test elements are a subset of the broader factors identified by the Interstate Commerce Commission's MC-207 guidance. *Ex-Parte No. MC-207*, 1992 MCC LEXIS 50, 8 I.C.C. 2d 470 (1992); *Deherrera*, 820 F.3d at 1157-58 (summarizing history of MC-207). Consideration of the remaining MC-207 factors further confirms that the exemption is inapplicable where the correct shipper is identified here.

As to the tracking factor, there is no evidence in the record that McLane's suppliers actually track shipments on their interstate journey to McLane's RDC warehouse, and certainly no evidence that the suppliers track products after they reach McLane's warehouse through to their final destinations. Moreover, McLane offered no evidence of whether it had the actual ability to track inbound shipments, and instead offered only speculation that it might be able to. 2-ER-270–271, ¶ 17.

As to warehouse ownership, McLane's suppliers do not own the RDC warehouse. McLane does, but McLane is not the interstate shipper.

As to any storage-in-transit provision, McLane has produced no evidence that its contracts with suppliers contain such a provision. All inferences must be drawn in favor of Plaintiffs, including an inference that McLane's contracts with its suppliers do not contain a storage-in-transit provision.

As to time limitations on storage in McLane's warehouse, there is no evidence that McLane's suppliers made any provisions whatsoever for what McLane may or may not do with products after delivery to the RDC warehouse. Once title passes on delivery, it is entirely up to McLane whether it can resell and distribute the products it purchased prior to their spoilage.

As to the shipper's knowledge of the ultimate destination of its goods at the time of shipping from out of state, the record is clear that the shippers, McLane's suppliers, only know that the goods are to be delivered to McLane's RDC warehouse, for potential subsequent resale to McLane's hundreds of local restaurant customers. Yet the record contains no evidence that the suppliers know who those specific customers are, where their restaurants are located, or where the specific goods shipped will end up.

As to bills of lading and changes in carriers, the record is clear that inbound shipments are handled by different carriers, with the products unloaded and stored in either general inventory or separate proprietary inventory inside McLane's warehouse, only to be later resold and re-shipped by McLane's own employees.

Thus, the ICC's MC-207 factors as applied here also confirm a break in the continuity of interstate movement when the goods arrived at McLane's local warehouse.

In short, the controlling precedent and the record are clear that the practical continuity of the movement of goods in interstate commerce terminates at McLane's warehouse. The district court erred in concluding otherwise, and its orders granting summary judgment in favor of McLane, and denying summary judgment in favor of Plaintiffs as to the Motor Carrier Act exemption, should be reversed.

## CONCLUSION

In applying the FLSA's Motor Carrier Act exemption to the record before it, the trial court misapplied substantive law in concluding that the relevant shipper is McLane, rather than McLane's suppliers. The record is undisputed and clear that the suppliers intended that the

practical continuity of the movement of goods in interstate commerce terminate at McLane's warehouse. The district court erred in concluding otherwise. For those reasons, Plaintiffs urge this Court to reverse the district court's orders granting summary judgment in favor of Defendant and denying summary judgment in favor of Plaintiffs as to the Motor Carrier Act exemption.

Alternately, at a minimum the record reflects a genuine dispute of material fact as to who the relevant shipper is, and what they intended as the ultimate destination of their goods at the time of placing their goods in interstate transport. As such, Plaintiffs urge this Court to reverse the district court's grant of summary judgment in favor of McLane should be reversed.

Dated: June 5, 2025          Respectfully submitted,

By: */s/ Glenn A. Danas*
    Glenn A. Danas
    gdanas@clarksonlawfirm.com
    Brent A. Robinson
    brobinson@clarksonlawfirm.com
    CLARKSON LAW FIRM, P.C.
    22525 Pacific Coast Highway
    Malibu, CA 90265
    Tel: (213) 788-4050
    Fax: (213) 788-4070

42

Aashish Y. Desai (187394)
aashish@desai-law.com
Adrianne De Castro (238930)
adrianne@desai-law.com
DESAI LAW FIRM, P.C.
3200 Bristol Ave., Suite 650
Costa Mesa, CA 92626
Tel: (949) 614-5830
Fax: (949) 271-4190

*Attorneys for Plaintiffs -
Appellants/Cross-Appellees
Jordan Orozco Madero and Esteban
Orosco*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Cir. R. 32-1 because it contains 8,136 words, excluding the parts of the brief exempted by Cir. R. 32-1(c) and Fed. R. App. P 32(f).

2. This brief complies with the typeface and type-size requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word, in 14–point size.

Dated: June 5, 2025                    By: */s/ Glenn A. Danas*
                                            Glenn A. Danas

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2025, I electronically filed the foregoing with the Clerk and the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 5, 2025                   By: */s/ Glenn A. Danas*
                                          Glenn A. Danas